UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| DORIS JEAN RHINESMITH, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:07-121-JMH |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION AND ORDER** |
| SECURITY | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*    \*\*    \*\*    \*\*    \*\*

This matter is before the Court upon cross-motions for summary judgment on the plaintiff's appeal of the Commissioner's denial of her application for Supplemental Security Income and Disability Insurance Benefits [Record Nos. 11, 12].[1]  The Court, having reviewed the record and being otherwise sufficiently advised, will deny the plaintiff's motion and grant the defendant's motion.

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff filed for disability benefits on November 19, 2004, alleging an onset of disability of November 1, 2004, due to arthritis, hand pain, and nervousness.  Her claim was denied initially and on reconsideration [AR at 21-30].  She then timely requested a hearing on June 6, 2005.  [AR at 31.]  A hearing on her

_____

[1] These are not traditional Rule 56 motions for summary judgment.  Rather, it is a procedural device by which the parties bring the administrative record before the Court.

1

application was conducted on July 21, 2006, and her application was subsequently denied by Administrative Law Judge ("ALJ") Gloria B. York in a decision dated September 19, 2006. [AR at 12-18; 222-72.] Plaintiff timely requested a review of the hearing decision [AR at 9], which was denied on March 8, 2007. [AR at 5-8.] This matter is ripe for review and properly before this Court under § 205(c) of the Social Security Act, 42 U.S.C. § 405(g).

Plaintiff was fifty-seven-years-old at the time of the final decision by the ALJ. [AR at 226.] She has a high school education and past relevant work experience as a janitor and an inspector trimmer. [AR at 227-28.] Plaintiff has not worked since the date of the alleged onset of her disability.

The treatment records of Dr. Jeffrey J. Green, Plaintiff's treating physician, indicate that he saw and treated Plaintiff over several years for hypercholesterolemia, hypertension, anxiety disorder, fatigue and malaise, skin rashes, symptoms of menopause, as well as routine health maintenance issues. [AR at 196-215.] On March 4, 2003, he treated Plaintiff for pain in her right heel, which she reported having experienced for five years with increasing severity. [AR at 204.] He assessed right plantar fasciitis, administered a cortisone injection and advised the use of a heel cup and stretching exercises.[2] [AR at 204.] A short

_____

[2] "Fasciitis" being the "inflammation of fascia" and "plantar fascia" being the "aponeurosis plantar" or the "bands of fibrous tissue radiating toward the bases of the toes from the

2

time later, on April 25, 2003, Anthony J. McEldowney, M.D., a specialist who treated Plaintiff, noted that the prior cortisone injection had provided Plaintiff with no relief for the heel pad syndrome and recommended gel heel supports, ice, and anti-inflammatory drugs, as well as flexibility exercises, noting that there were no indications for surgery at that time. [AR at 127.] There are no further treatment records for heel pain in the record of this matter.

On July 6, 2004, during an annual physical, she complained of pain and swelling in her fingers. [AR at 199.] Dr. Green assessed her with arthritis and recommended a variety of medications for the condition. [AR at 198.] On September 27, 2004, Dr. McEldowney assessed Plaintiff with left thumb CMC joint instability with post-traumatic arthrosis. [AR at 126.]

On September 29, 2004, she saw Caroline Kern, a nurse practitioner in the offices of James L. Ferrell, M.D., at the request of her then-employer, Kentucky Textiles. Plaintiff has testified that her employer sent her to Dr. Ferrell because her "hand was swollen and [her] hands were hurting. . . ." [AR at 249.] Indeed, Nurse Kern observed:

> She does have some visible inflammation

_____

medial process of the tuber calcanei," the Court understands plantar fasciitis to be an inflammation of certain bands of tissue which run from the heel (the "tuber calcanei") to the toes in the human foot. *Dorland's Illustrated Medical Dictionary* 107, 245, 610-12, and 1754.

> changes on the palmar aspect of the left hand, specifically over the first metacarpophalangeal joint. There is point tenderness here. Range of motion of the left thumb is painful. The wrist shows no ecchymosis or deformity. No crepitus with range of motion. No palpable boggy joints. No visible or palpable tenderness. No inflammation over the right hand. She complains of morning stiffness here. Strength is 5/5 in both upper extremities, as well as her hands.

[AR at 129.] She was assessed with "bilateral hand pain diagnosed by Dr. McEldowney with repetitive arthritis." [AR at 129.] Kern stated that she had "[n]o work restrictions." [AR at 129.]

On October 13, 2004, Plaintiff followed up with Nurse Kern for the repetitive arthritis in her left hand, where Nurse Kern noted that Plaintiff had "been able to avoid the repetitive motion work and also has completed the Medrol Dosepak and is much improved." [AR at 128.] Nurse Kern observed that "[t]here is no further edema or erythema over the left thumb and palmar surface of the left hand. Range of motion of the thumb is intact without pain." [AR at 128.] Plaintiff was assessed with "resolved repetitive arthritis exacerbation." [AR at 128.] Kern further stated that Plaintiff could "return to full duty without restrictions. No further follow-up needed." [AR at 128.]

Dr. Green again treated Plaintiff for arthritis of the hands and fingers on November 17, 2004, prescribing Paroxicam 20 mg. She was referred to a neurologist, Regina Raab, M.D., and was seen on December 1, 2004, complaining of chronic pain in her hands. Dr.

4

Raab noted good strength, intact sensation, brisk upper extremity reflexes, and positive Hoffman's and Tromner's signs. [AR at 138.] She also noted "some joint deformities[,] particularly over the distal metacarpals[,] [p]articularly as well in the index finger and some mild hint of swan neck changes." [AR at 138.] At that time, Dr. Raab's impression was "[p]ossible median nerve compromise in both hands," although she could not "exclude the possibility of some arthritic changes particularly with the joint deformities that [were] noticed." [AR at 138.]

Dr. Raab ordered further testing. [AR at 138.] A nerve conduction study of the upper extremities on December 6, 2004 ruled out carpal tunnel syndrome. [AR at 130, 137.] A five view x-ray series of cervical spine, conducted on December 1, 2004, was unremarkable. [AR at 131 and 137.] Blood tests for "CBC, sed rate, rheumatoid factor, [and] ANA levels" were "within normal limits." [AR at 137.]

Dr. Raab stated in her impressions from the neurology consultation with Plaintiff that:

> My suspicion is that we are dealing with arthritic changes in the hand as a source of a lot of her symptomatology. At this point I don't have any neurologic explanation for her intermittent pain, but regarding her findings on joint size and areas where the pain is mostly over the joint area, I do suspect that this is the source of her symptoms.

[AR at 137.] She referred Plaintiff back to Dr. Green for further treatment.

Eventually, Dr. Green sent Plaintiff for evaluation at Paris Physical Therapy Associates, where physical therapist Amy Broaddrick completed a detailed functional capacity evaluation with Plaintiff on June 8, 2005.  [AR at 181-91.]  She reported that Plaintiff could lift and/or carry items weighing between 8 and 18 lbs., depending on the type of movement required.  [AR at 185.] She remarked that Plaintiff showed "signs of increased muscle recruitment and abnormal positioning with any activity requiring weight bearing or movement of the right lower extremity."  [AR at 186.]  Ms. Broaddrick further observed that Plaintiff "showed increased deficits in the left elbow in relationship to the right with many strength tests" and "had decreased grip strength in the bilateral hands that did correlate with pain in that area during testing."  [AR at 186.]  She opined that Plaintiff was "unable to safely lift more than 10 pounds at her waist or above without objective pain behavior."  [AR at 186, 188.]

Ms. Broaddrick evaluated Plaintiff's ability to stand and/or walk as impaired, although the extent of impairment would depend upon the type of surface.  [AR at 188.]  She further evaluated Plaintiff's sitting as impaired such that Plaintiff "must periodically alternate sitting and standing to relieve pain or discomfort."  [AR at 189.]  As for pushing and/or pulling, Ms. Broaddrick found Plaintiff's ability to be affected by the impairment, very limited in the upper extremities due to decreased

grip and in the lower extremities due to heel pain.  [AR at 189.]
She also found Plaintiff to have postural limitations, estimating
that Plaintiff could occasionally, i.e., from very little up to
one-third of an 8-hour workday, climb, balance, kneel, crouch,
crawl, or stoop.  [AR at 189.]  Ms. Broaddrick further indicated
that Plaintiff's ability to manipulate – reaching in all
directions, handling, and fingering – were "limited" by her
impairment and that Plaintiff could perform these manipulative
functions only "occasionally."  [AR at 190.]  On June 27, 2005, Dr.
Green completed a Medical Source Statement of Ability to Do Work-
Related Activities which adopted the findings of Ms. Broaddrick.
[AR at 192-95.]

Agency consulting psychiatrist Christi M. Hundley, Ph.D.,
examined Plaintiff on January 7, 2005.  [AR at 139-147.]  Dr.
Hundley observed that Plaintiff "appeared somewhat anxious to this
examiner . . . [but that] [h]er mood in general . . . appeared
euthymic."  [AR at 146.]  The examiner diagnosed Plaintiff with an
adjustment disorder with depressed and anxious mood and assigned
her a GAF of 65.  [AR at 146.]  She opined that Plaintiff's anxiety
"appeared to hinder her ability to concentrate and think clearly,"
and that "[h]er presentation during this evaluation suggested she
would have minimal problems with tasks requiring sustained
concentration, but otherwise her mental health did not appear to
provide sufficient reason to bar her from all employment."  [AR at

147.]

An agency non-examining, consulting psychiatrist, Ann Demaree, Ph.D., opined on February 7, 2005, that Plaintiff's mental impairments due to adjustment disorder with depressed and anxious mood were not severe and that the symptoms did not appear to [exert a severe impact on functioning." [AR at 149, 152, and 161.] She rated Plaintiff's restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace as mild. [AR at 159.] She found that Plaintiff had experienced no episodes of decompensation. [AR at 159.]

Similarly, agency non-examining, consulting psychiatrist Jay Athy, Ph.D., opined on April 4, 2005, that Plaintiff's mental impairments due to adjustment disorder with depressed and anxious mood were not severe. [AR at 164, 167; *see also* AR at 178-79.] He rated Plaintiff's restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace as mild. [AR at 174.] He found that Plaintiff had experienced no episodes of decompensation. [AR at 174.]

An agency non-examining, consulting physician, James T. Ramsey, M.D., opined on February 2, 2005, that her impairments were not severe, adopting the "not severe rationale" dated February 1, 2005, which reads as follows:

> Claimant's allegations of basic work related
> limitations are not fully credible.  There are
> not [treating physician's] opinions to address
> at this time.  These impairments, singly or
> combined, impose no significant limitations on
> basic work related activities.

[AR at 108, 148.]

Plaintiff testified at her hearing that she had arthritis in her hands and that she had taken steroid pills in the past for the inflammation.  [AR at 232.]  She described her symptoms as swelling, aching, throbbing, drawing, and inability to grip.  [AR at 232.]  She takes Aleve and Tylenol for the pain as necessary, but avoided the pain relievers unless she couldn't "stand the pain" because they cause stomach irritation.  [AR at 233.]  She takes no medication for her reported nervousness, which she describes as feeling "[h]yperactive, just nervous inside, uncalmness, stressed and not . . . able to sleep."  [AR at 233-34.]  As to her "bad heel on [her] right foot," she testified that she does not "put a lot of weight on it or a lot of pressure on it because it hurts a lot when [she is] either standing, sitting, or anything."  [AR at 234.]  In her own words, she "just [does] less than what [she] used to do" because her condition "cuts down on [her]. . . cleaning activities and general . . . activities."  [AR at 235.]  She spends "more time doing nothing than [she does] doing things that [she would] like to be doing because of the pain [she has] in [her] foot and in [her] hands."  [AR at 235.]

She testified, as well, that her "back bothers [her] when

[she] sit[s] . . . for any period of time," but that she spends time:

> . . . in a recliner as much as I can to elevate my feet up or my foot, especially my right foot, so I don't have to put it down on the ground.  And I just sit there and try to give comfort to my hands and relief to where I don't have to do anything with them at all except for just sit there.

[AR at 235.]

    Plaintiff left her job at Kentucky Textile that she had held for 20 years because the need for "hustling," i.e., having to accomplish tasks within a set amount of time as opposed to accomplishing a task at one's own pace, and "having to be on [her] feet all the time . . . and using [her] hands all the time in a hustling manner" caused "pain, continuous pain." [AR at 231.] She explained that the same issues were present in her subsequent and short-lived janitorial cleaning job. [AR at 231.] She stated that she had nodes and disfigurations on both hands and that sometimes she experiences a "drawing sensation" and "can't bend" her fingers. [AR at 242.]  She has trouble carrying objects like books, coffee cups, and other normal objects on a day-to-day basis.  [AR at 242.] She testified that turning pages causes pain in her hands, that she has trouble writing, picking up coins or small objects from a table, choosing to scoop things up rather than pick them up individually.  [AR at 243.]  She testified that she has trouble closing buttons and snaps.  [AR at 243.]  At her former job, she

10

had trouble using her hands to count the number of small items, like bandages, in a box and ripping the plastic wrapping around items due to pain.  [AR at 244.]

Prior to the onset of her condition, Plaintiff "was a big walker" and walked "over three miles a day most days, at least about five or six days out of a week."  [AR at 237.]  She described how her symptoms get worse "[a]s the day passes on" and sometimes "depending on the weather," but always "the more I use it, the more they hurt."  [AR at 240.]  She described the pain in her foot as a throbbing sensation and, sometimes, "stabbing like."  [AR at 247.]  She testified that she has trouble pushing and pulling objects and that, while she can reach over her head, she does not want to have anything in her hands because she "would drop it" due to lack of strength in her hands.  [AR at 247-48.]

When she attends church twice a week, for "a couple hours," Plaintiff testified that she alternates sitting and standing and that she generally does not use her hands because her husband would hold the songbook or she would view text on a board.  [AR at 250.]

In a third-party function report, Plaintiff's husband, Robert G. Rhinesmith, stated that Plaintiff worked, did all of the housework and cooking in their home, and was very active prior to the alleged onset of her disability.  [AR at 77.]  Following the onset of her disability, she became limited to light housework or laundry.  [AR at 76.]  He explained that on a daily basis she only

prepares meals that are "quick and easy to microwave," and that she no longer prepared full meals because she "can't lift, grip or hold onto things. She can't open jars. She hurts when trying to mix or stir ingredients." [AR at 78.] He now helps her with "vacuuming, mopping, sweeping and cleaning the mirrors." [AR at 78.]

He describes how his wife's ability to drive more than short distances is limited by her trouble gripping the steering wheel which increases her pain. [AR at 79.] Nonetheless, his wife shops on a weekly basis for half-an-hour to an hour in order to "get what [groceries and household items] she needs." [AR at 79.] Other items, she orders by mail or phone to eliminate the need to go to a store. [Id.] Although Plaintiff is able to pay bills, count change, handle a savings account, and use a checkbook or money orders, her husband observed that "[i]t hurts her to pick up change/money." [AR at 79.]

He described how Plaintiff takes a hot shower to deal with her stiffness in the morning, rests to alleviate her pain, has trouble sleeping, and is "up and down all night because she hurts." [AR at 76.] He further explained that her condition impacted her sleep because she "is restless and up a lot" due to the pain in her hands. [AR at 77.] Mr. Rhinesmith described how his wife now avoids buttons and belts, tries to hold her silverware differently "to find comfort from pain," has increased pain when shampooing her hair and as a result of the actions necessary to bathing and

12

shaving.  [AR at 77.]  She also has problems and pain when attempting to adjust her clothing after toileting.  [*Id.*]

Mr. Rhinesmith reports that, prior to the onset of her condition, his wife "read all the time" and "really enjoyed" reading, but now "it increases her pain to turn the pages." [AR at 80.]  Her ability to take phone calls is impacted because holding a phone "hurts her hands." [AR at 80.]  Although she has no problems getting along with others and does not need someone to accompany her when she goes out (including attending church twice a week), her husband states that "[s]he used to be very active[,] but now she goes out a lot less." [AR at 80.]  He observes, as well, that "[s]he's nervous, upset and depressed because she can't do the things she wants or needs to.  She's more anxious now." [AR at 82.]  This impacts her ability to handle stress and changes in routine.  [*Id.*]

He remarks, as well that:

> Doris and I used to enjoy taking walks and shopping together.  But now I have to help her a lot with the housework and cooking because she can't do things.  She doesn't want to try anything or do things because of the pain in her hands.  She complains a lot about her pain and deals with it daily.  When she was working it was much worse and we thought once she quit it would decrease but it hasn't.

[AR at 84.]

The ALJ considered the written evidence and testimony at the hearing and, in a decision dated September 19, 2006, found that

Plaintiff's impairments did not have more than a minimal impact on her ability to perform basic work activities and therefore she did not have a severe impairment.  As a result, she was not found to be disabled under 20 C.F.R. § 404.1520(c). The ALJ made the following findings in determining that Plaintiff was not entitled to disability benefits:

> 1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.
>
> 2.   The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b)).
>
> 3.   The claimant has the following impairments:  hand pain, right heel pain, and a diagnosed adjustment disorder (20 CFR § 404.1520(c)).

[*Id.* at 14-17.]  With regard to Plaintiff's impairments, the ALJ found that they did "not impose more than a slight or minimal limitation in her ability to perform basic work-related activities on a sustained basis and are not 'severe' within the meaning of the Social Security Act." [*Id.* at 15.]

The ALJ made further findings as follows:

> 4.   Even if the claimant's impairments are "severe", the Administrative Law Judge finds they do not meet or equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).  Further the Administrative Law Judge finds that even if the claimant's impairments are "severe", she has a residual functional capacity for medium work as defined by 20 CFR 404.1567 and she is able to grasp and handle with both upper extremities two-thirds of an eight hour day.

14

> 5. The claimant can return to her past relevant work as a packer/inspector as it is customarily performed in the national economy even if her impairments are "severe".
>
> 6. The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

[*Id.* at 17.] In reaching her decision, the ALJ found that the Plaintiff's subjective complaints of pain were not fully credible. [*Id.* at 16.]

## II. OVERVIEW OF THE PROCESS

The Administrative Law Judge ("ALJ"), in determining disability, conducts a five-step analysis:

> 1. An individual who is working and engaging in substantial gainful activity is not disabled, regardless of the claimant's medical condition.
>
> 2. An individual who is working but does not have a "severe" impairment which significantly limits his physical or mental ability to do basic work activities is not disabled.
>
> 3. If an individual is not working and has a severe impairment which "meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s)", then he is disabled regardless of other factors.
>
> 4. If a decision cannot be reached based on current work activity and medical facts alone, and the claimant has a severe impairment, then the Secretary reviews the claimant's residual functional capacity and the physical and mental demands of the claimant's previous work. If the claimant is able to continue to do this previous work, then he is not disabled.
>
> 5. If the claimant cannot do any work he did in the past because of a severe impairment, then the

15

> Secretary considers his residual functional
> capacity, age, education, and past work experience
> to see if he can do other work.  If he cannot, the
> claimant is disabled.

*Preslar v. Sec'y of Health and Human Servs*, 14 F.3d 1107, 1110 (6th Cir. 1994) (citing 20 CFR § 404.1520 (1982)).  "The burden of proof is on the claimant throughout the first four steps of this process to prove that he is disabled."  *Id.*  "If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Secretary."  *Id.*

**III. STANDARD OF REVIEW**

In reviewing the ALJ's decision to deny disability benefits, the Court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). Instead, judicial review of the ALJ's decision is limited to an inquiry into whether the ALJ's findings were supported by substantial evidence, 42 U.S.C. § 405(g), *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001), and whether the ALJ employed the proper legal standards in reaching his conclusion, *see Landsaw v. Sec'y of Health and Human Servs*, 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence" is "more than a scintilla of evidence, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip*, 25 F.3d at 286.

16

## IV.  ANALYSIS

At step two of the sequential process set forth in 20 C.F.R. § 404.1520, Plaintiff must demonstrate that she has a "severe" impairment.  20 C.F.R. § 404.1520(c).  A severe impairment is one which significantly limits an individual's ability to perform basic work activities regardless of age, education, or work experience. 20 C.F.R. § 404.1521; *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  To meet this burden, Plaintiff "must make a threshold showing that [her] 'medically determinable' impairments are severe enough to satisfy the regulatory standards." *Bowen v. Yuckert*, 482 U.S. 137, 145 (1987).

Plaintiff argues that she bore her burden and that the ALJ improperly discounted her symptoms of pain in determining that she does not have a severe impairment.  A claimant's testimony regarding symptoms, however, is only relevant to the extent that a medically determinable impairment is present.  *See* SSR 96-3p, 1996 WL 374181.

SSR 96-3p provides that:

> Symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect an individual's ability to do basic work activities unless the individual first establishes by objective medical evidence (i.e., signs and laboratory findings) that he or she has a medically determinable physical or mental impairment(s) and that the impairment(s) could reasonably be expected to produce the alleged symptom(s).

*Id*. at *2.  Stated otherwise, one must consider "whether the

17

objectively established medical condition is of such a severity
that it can reasonably be expected to produce the alleged disabling
pain." *Blacha v. Secretary of Health and Human Servs*, 927 F.2d
228, 230 (6th Cir. 1990) (citing *Duncan v. Secretary of Health and
Human Servs,* 801 F.2d 847, 853 (6th Cir. 1986)).

With regard to Plaintiff Rhinesmith, the ALJ wrote that she
found "the claimant's statements concerning the intensity,
duration, and limitations from her impairments . . . not credible
because they are inconsistent with the objective findings." [AR
at 16.] In her decision, ALJ York weighed whether the medically
determinable physical impairments – hand pain and foot pain due to
arthritis and plantar fasciitis – could reasonably be expected to
produce the extreme and limiting pain reported by Plaintiff
considering the objective medical evidence.

Certainly, ALJ York recognized the fact that Plaintiff had
been seen and treated for pain and, effectively, recognized that
Plaintiff suffered from a series of underlying medical conditions
which caused those conditions. [AR at 15-16.] Nonetheless, the
ALJ identified what she felt to be a dearth of objective evidence
to support Plaintiff's claims of severe chronic pain in her hands
and her foot. Specifically, the ALJ noted that Plaintiff had been
seen by a physician only one or, at most, two times for foot pain
even though Plaintiff states that she must regularly elevate her
foot while seated due to constant pain. [AR at 16.] The ALJ was

18

further troubled because Plaintiff had been treated for recurrent hand pain, ascribed to arthritis, but had "completely normal findings on x-rays, electromyogram with nerve conduction studies, and serologic tests for inflammatory arthritis." [AR at 16.] Further, the ALJ noted that "the claimant takes no medication for her pain . . ., other than over[-]the[-]counter Aleve and Tylenol." [AR at 16.]   Finally, Plaintiff's claims to severe pain notwithstanding, the ALJ noted that Plaintiff "is able to cook, clean, attend church twice a week, and engage in other activities of daily living." [AR at 16.]   In other words, the ALJ felt that claimant's style of life was not consistent with that of a person who suffers from intractable pain.

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *See Walters,* 127 F.3d at 531 (citation omitted). Notwithstanding that deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id.* (citation omitted).   In the instant matter, the ALJ has identified those uncontroverted portions of the record evidence which support her conclusion, i.e., her assessment is supported by substantial evidence.   As such, this Court cannot say that the ALJ erroneously determined that the impairments that Plaintiff presented imposed no more than a "slight or minimal limitation in

19

[Plaintiff's] ability to perform basic work-related activities on a sustained basis." [AR at 16.]

Of course, the ALJ did not completely abandon the analysis of disability at step 2, but continued on to evaluate whether Plaintiff's impairments, even if found to be severe, met or equaled a listed impairment and determined that they did not. Plaintiff does not challenge this finding. Plaintiff does argue, however, that substantial evidence does not support the ALJ's additional determination that, even if Plaintiff's impairments are "severe," she has a residual functional capacity for medium work as defined by 20 C.F.R. § 404.1567 and is able to grasp and handle with both upper extremities two-thirds of an eight hour day. Since the Court has determined that the ALJ did not err in reaching a decision that Plaintiff's impairment was not severe, it need not reach this question and declines to do so.

## V. CONCLUSION

For the foregoing reasons, **IT IS ORDERED:**

(1) That the Commissioner's motion for summary judgment [Record No. 12] shall be, and the same hereby is, **GRANTED.**

(2) That the plaintiff's motion for summary judgment [Record No. 11] shall be, and the same hereby is, **DENIED.**

20

This the 30th day of September, 2008.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge